UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

BRENDA LEE HOPPER, )
)
       Ms. Hopper, )
) No. 09 C 7884
vs. )
)
MICHAEL J. ASTRUE, ) Magistrate Judge Keys
Commissioner of Social )
Security )
)
       Defendant, )

## MEMORANDUM OPINION AND ORDER

Plaintiff, Brenda Lee Hopper, moves this court for summary judgment pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, to reverse or remand the final decision of the Commissioner of Social Security (the "Commissioner"), who denied her claim for Disability Insurance Benefits (DIB). Defendant Commissioner has filed a cross-motion for summary judgment. For the reasons set forth below, the Court denies Ms. Hopper's motion for summary judgment and grants the Commissioner's cross-motion for summary judgment.

## STATEMENT OF FACTS

**A. Procedural History**

Ms. Hopper filed an application for DIB on December 1, 2004, alleging a disability onset date of February 18, 2003. Ms. Hopper was last insured for such benefits on September 30, 2004.

The Social Security Administration ("SSA") denied Ms. Hopper's initial claim on May 16, 2005 and again upon reconsideration on September 25, 2005. Subsequently, Ms. Hopper requested a hearing before an Administrative Law Judge ("ALJ"). ALJ Denise McDuffie Martin held Ms. Hopper's hearing on January 31, 2007 and issued a decision denying Ms. Hopper's claim for DIB on July 11, 2007. Ms. Hopper appealed. On June 10, 2008, the Appeals Council vacated the July 11, 2007 order and remanded the case for further consideration of Ms. Hopper's maximum residual functional capacity, especially with respect to any limitations caused by Ms. Hopper's obesity, for the period of time through September 30, 2004. The Appeals Council directed that, if warranted, the ALJ should obtain supplemental evidence from a vocational expert ("VE") to clarify the effect of Ms. Hopper's obesity on her occupational base. ALJ Martin held a second hearing on September 30, 2008 and issued a second decision denying Ms. Hopper's claim for DIB on March 11, 2009. On October 30, 2009, the Appeals Council denied Ms. Hopper's request for review, making the ALJ's decision the final decision of the Commissioner.

On April 7, 2009, Ms. Hopper requested judicial review of the ALJ decision denying her claim. The case was initially assigned to Judge Elaine E. Bucklo in the Northern District of Illinois. The parties consented to proceed before a United

States Magistrate Judge, and the case was reassigned to this Court on March 22, 2010. Thereafter, both parties moved for summary judgment.

**B. Medical History**

From September 1998 until February 2003, Ms. Hopper worked as a bus driver for First Union. R. at 669, 687.[1] During this time period, Ms. Hopper's work duties included inspecting the bus, driving routes, timing routes, and picking up and dropping off children. R. at 670. On February 18, 2003, Ms. Hopper, then thirty-two years old, slipped and fell on ice in her employer's parking lot. R. at 158. Several days after the injury, she began to feel pain in her back. R. at 702. On March 7, 2003, Dr. John Saran, Ms. Hopper's primary care physician at the time, ordered Magnetic Resonance Imaging ("MRI") scans for the thoracic, cervical and lumbar spines. R. at 265-267. The thoracic spine MRI scan showed "small central disc protrusion herniation at T8-T9 level." R. at 265. The cervical and lumbar spine MRI scans showed no disc herniation. R. at 266-267.

On March 13, 2003, Ms. Hopper went to the emergency room complaining of back and chest pain, nausea, vomiting and numbness and tingling in her hands and feet. R. at 236-237. Ms. Hopper

---

[1] The page numbers cited are those given in Docket #9, and not those stamped on the hardcopy version of the administrative record.

told emergency room physicians that she suffered from herniated discs and had been unresponsive to oral pain medication at home. *Id.* Dr. Yousuf Sayeed examined Ms. Hopper and noted that she could have a thoracic herniated disc or a muscle spasm with facet arthropathy and that her nausea and vomiting may be related to her pain. R. at 238-239, 703. Between March 2003 and approximately January 2004, Ms. Hopper received thoracic epidural injections, chronic pain medication, physical therapy and heat treatments to relieve pain. R. 223, 225, 230, and 234. Dr. Sayeed reported that physical therapy and heat treatments temporarily improved Ms. Hopper's pain and recommended that Ms. Hopper undergo another course of physical therapy and weight loss. R. at 219.

In February 2004, Dr. Sayeed began weaning Ms. Hopper off oral pain medication. R. at 218. He reduced Ms. Hopper's MS Contin from six tablets per day to four tablets per day and recommended work-hardening activities and physical therapy as needed. *Id.* Dr. Sayeed also suggested that Ms. Hopper see a pain pathologist. *Id.* Dr. Andreshak, who also treated Ms. Hopper's pain, agreed with Dr. Sayeed's plan to reduce medication and focus on physical therapy and weight loss. *Id.*

In March 2004 and April 2004, Dr. Saran diagnosed Ms. Hopper with persistent upper respiratory infection. R. at 426-427.

4

During this time, Ms. Hopper also complained of shortness of breath, which Dr. Saran attributed to Ms. Hopper's weight and anxiety. R. at 426.

On May 4, 2004, Dr. Martin Lanoff performed an independent evaluation of Ms. Hopper. R. at 334. Dr. Lanoff opined that degenerative thoracic disc herniations were not causing Ms. Hopper's severe back pain or extremity numbness. R. at 339. Rather, Dr. Lanoff stated that Ms. Hopper's "physical examination findings and subjective complaints do not correlate with degenerative disc changes" because "one would expect to have significant degenerative disc changes in multiple areas of the thoracic spine" and "[Ms. Hopper's] MRI did not change between March and November to any large extent." R. at 339. Further, Dr. Lanoff stated that he saw "no evidence of any injury in [Ms. Hopper] whatsoever." R. at 340.

On May 11, 2004, Ms. Hopper went to the emergency room at Edward Hospital, complaining that she had quickly moved from a sitting position to standing position to grab her child and, within a few steps, felt a blackness come over her and passed out. R. at 214. Emergency room physicians ordered a CT brain scan, which showed no abnormalities in the brain function, and diagnosed Ms. Hopper with syncope, temporary loss of consciousness or posture described as "fainting" or "passing

5

out." *Id*. The following day, Dr. Saran examined Ms. Hopper, concluded that she likely suffered from syncope or increased muscle spasm and ordered an MRI, a 24-hour Holter monitor and a 2-D echocardiogram to rule out heart problems. R. at 350.

On June 21, 2004, Dr. Andreshak examined Ms. Hopper. R. at 319. During the examination Ms. Hopper complained of back pain, described various activities that seemed to cause the pain and asked to have a CT myelogram.[2] *Id*. Dr. Andreshak refused Ms. Hopper's request for a CT myelogram and stated that, based on the MRI, he found "no obvious finding that relates to any nerves causing back pain in [Ms. Hopper's] back." *Id*. Rather, Dr. Andreshak concluded that Ms. Hopper's pain appeared to be soft tissue and mechanical in nature, not structural. *Id*. Dr. Andreshak also told Ms. Hopper that he planned to wean her off of narcotics, that she needed to be detoxified and that hospitalization would be best for her. *Id*.

On June 25, 2004, Ms. Hopper underwent a functional capacity evaluation at Dr. Andreshak's request. R. at 320. The examiner determined that Ms. Hopper had a work tolerance at a sedentary physical demand level, but noted that the validity of this determination was questionable due to Ms. Hopper's sub-maximum

---

[2] Dr. Andreshak's notes state that a CT myelogram "is an invasive test and is only used for preoperative evaluation in terms of planning surgical routes and bony decompressions." R. at 319.

6

physical test effort. *Id.* On July 12, 2004, Dr. Andreshak produced a work status report indicating that Ms. Hopper could return to full duty without any restrictions on July 13, 2004. R. at 331. Additionally, on August 5, 2004, Dr. Louis Papaliou, who evaluated Ms. Hopper and reviewed her medical records, also opined that Ms. Hopper should be able to return to work as long as she was weaned off narcotics and detoxified. R. at 342.

Between mid-August 2004 and the end of September 2004, Ms. Hopper frequently visited Dr. Saran for back pain. Ms. Hopper repeatedly called Dr. Saran's office requesting pain medication refills, additional pain medication, such as morphine, and increased dosages of current pain medication. R. at 371-374. Dr. Saran refused to prescribe morphine, but increased Ms. Hopper's Norco dosage and then eventually refused to prescribe any additional pain medication. R. at 371. Ms. Hopper again requested a CT myelogram, the same test that Dr. Andreshak had previously refused to order. R. at 319, 368. Dr. Saran ordered the test. R. at 368. He also referred Ms. Hopper to a chiropractor for six weeks, and dictated a letter seeking approval for gastric bypass surgery for Ms. Hopper. *Id.*

On September 30, 2004, Ms. Hopper's date last insured ("DLI"), Dr. Saran examined Ms. Hopper, found focal protruding discs at T5-6, T6-7, T8-9, T9-10 and T10-11, with the most

7

prominent protruding at T8-9 and T9-10, and concluded that Ms. Hopper had extensive degenerative disc disease in the thoracic spine and spinal stenosis. R. at 212. On November 11, 2004, Dr. Saran opined that Ms. Hopper would not be able to return to work in any job that would require prolonged sitting, standing, bending, or stooping. R. at 204. Dr. Saran also opined that Ms. Hopper would need to change from a standing to sitting position more than once every two hours to relieve pain in her back. *Id.*

On December 1, 2004, Ms. Hopper protectively filed an application for DIB. R. at 180. Shortly thereafter, Ms. Hopper reported sleep difficulties and underwent several sleep studies, which showed that she experienced overall mild apnea with moderate apnea occurring in the sapine sleep. R. at 289. Ms. Hopper's doctors recommended titration and nasal CPAP to keep the windpipe open during sleep and to prevent the episodes of blocked breathing. *Id.*

A few months later, Dr. Victoria Dow performed a physical residual functional capacity assessment of Ms. Hopper. R. at 304. Dr. Dow remarked that she believed Ms. Hopper exaggerated complaints of pain and went from physician to physician seeking drugs. R. at 309. Dr. Dow further stated that the severity of Ms. Hopper's pain seemed "disproportionate to the physical findings in regard to her medically determinable impairment after

thorough examinations by unbiased physicians." *Id*. Subsequently, the SSA denied Ms. Hopper's initial claim for DIB and again upon reconsideration.

On November 23, 2005, Ms. Hopper requested a hearing before an ALJ. Between that time and the time of the hearing, Dr. Saran continued treating Ms. Hopper and prescribing pain and psychiatric medication. R. at 403. Ms. Hopper also underwent both carpal tunnel surgery for her right hand and gastric bypass surgery. R. at 504, 485. Ms. Hopper repeatedly requested additional pain and psychiatric medication from Dr. Saran, and Dr. Saran eventually referred her to a psychiatrist. *Id*. Dr. Mary Goebel, Ms. Hopper's psychiatrist, concluded that Ms. Hopper suffered from depression and marital, medical and financial stress. R. at 525.

C. **The ALJ's First Hearing & Decision**

During the January 31, 2007 hearing, Ms. Hopper testified that she is unable to work because she experiences back pain and, as a result, stays in bed two or three times a week. R. at 671. Ms. Hopper stated that the pain sometimes occurs in her mid-back, making it hard for her to breathe, and sometimes occurs in her upper-back, making it difficult to control her arms or neck. *Id*. Ms. Hopper also testified that, when pain occurs in her lower back, she generally has to sit down and has fallen down a couple

9

of times. *Id.*

Ms. Hopper testified that carpal tunnel also causes her pain and limits the range of motion and strength of her hands. R. at 672. Ms. Hopper stated that, even though she had carpal tunnel surgery on both hands, she still experiences problems with her right thumb and the muscle between her elbow and wrist. R. at 671-672. Ms. Hopper noted that the braces on her arm were to support and strengthen the muscle between her elbow and wrist. R. at 672.

Ms. Hopper testified that, generally, in the mornings her hands are swollen from tendinitis, making it difficult for her to maneuver them. R. at 672. Ms. Hopper stated that she can lift no more than five pounds, can stand for fifteen to twenty minutes at a time, sit for approximately twenty minutes at a time, drive approximately five miles and walk approximately one block. R. at 677-679, 690.

Ms. Hopper testified that she takes the following medications daily: Adderall, Allegra, Aciphex, Valium, Cymbalta, MS Contin, Requip, Bacolfen, Ambien, Flonase, Singulair, Vitamin C, Fioricet, One-a-Day Women's vitamin, Vitamin B12, Dilaudid, Norco, Morphine, Sulfate and Lidoderm patches. R. at 673-674. Ms. Hopper also stated that she uses a TENS unit, large ice packs and heating pads to try to control her pain. R. at 674. Ms.

Hopper explained that she feels tired from her medications and often needs someone to drive her and accompany her to the store. *Id.*

Ms. Hopper testified that she attempted to return to work for her previous employer, First Union, but that the site manager told her that they did not have any positions available for her. R. at 698. Ms. Hopper stated that she then went to a temp agency and asked them for available work with flexibility as far as sitting and standing, and that they too told her that they had nothing available. *Id.*

Dorothy Ann Scott, Ms. Hopper's friend and caretaker, also testified; she testified that she had been helping Ms. Hopper with her daily activities for the past four months and that she often found Ms. Hopper to be incapable of completing simple tasks or getting out of the bed. R. at 720. Ms. Scott testified that she would come to Ms. Hopper's home each morning, prepare Ms. Hopper's children for school and drive them to school. R. at 717. She testified that she would then return to Ms. Hopper's home and help her shower, dress and complete household chores. *Id.* Ms. Scott testified that she would pick Ms. Hopper's children up from school and help with preparing dinner, completing homework and putting out the children's clothes for the next day. R. at 718. When questioned by the ALJ, Ms. Scott

11

testified that she decided to help Ms. Hopper on a daily basis when she noticed Ms. Hopper "slipping in a real deep depression." R. at 719.

The ALJ also heard from William Spaniak, Ms. Hopper's husband, who testified that, since Ms. Hopper's February 2003 fall, she is been unable to do household chores or take care of their children. R. at 727. Mr. Spaniak stated that he noticed his wife becoming depressed after she hurt her back. R. 728. He also testified that, in order to care for the children, the household and Ms. Hopper, he needs assistance from Ms. Scott and from their family members. R. at 729-730.

The ALJ also heard from Dr. Daniel D. Girzadas, a medical expert, who testified that, based on Ms. Hopper's medical records from February 18, 2003 through June 23, 2006, her condition did not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. R. at 709. Dr. Girzadas testified that he believed Ms. Hopper could lift ten pounds frequently, stand and walk two hours and sit for six hours out of an eight-hour day, so long as Ms. Hopper alternated sitting on an hourly basis for approximately ten minutes. *Id.* Further, Dr. Girzadas testified that Ms. Hopper should not use foot controls but could use her hands and fingers frequently. R. at 710. Dr. Girzadas testified that, as far as environmental factors, Ms.

12

Hopper should avoid all exposure to unprotected heights, hazardous moving machinery and commercial driving. *Id.* Finally, Dr. Girzadas testified that Ms. Hopper could occasionally walk ramps or stairs, balance, squat, stoop, crouch, kneel or crawl. *Id.*

Next, the ALJ heard from Julia Lynn Bose, a vocational expert, who testified that an individual of Ms. Hopper's age, education and work experience subject to the limitations outlined by Dr. Girzadas would not be capable of doing any of Ms. Hopper's past work – bus driver, parts driver, data entry clerk, or cook. R. at 732. Ms. Bose then testified that other jobs in the national market could accommodate Ms. Hopper's limitations, including general office clerk, telephone clerk, and food and beverage order caller. R. at 733. Ms. Bose added that all of the jobs suitable for Ms. Hopper were simple, unskilled, routine and repetitive jobs. *Id.*

On July 11, 2007 the ALJ issued a decision finding that Ms. Hopper was not under a disability within the meaning of the SSA from February 18, 2003 through September 30, 2004. The ALJ found that: (1) the medical evidence of record established that through the date last insured, Ms. Hopper had degenerative disc disease of the thoracic spine, lumbar spine and cervical spine; carpal tunnel syndrome with surgical repair; generalized anxiety; and

depression; (2) the aforementioned impairments did not meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, specifically Listing 1.02, major dysfunction of a joint(s) (due to any cause), Listing 1.04, disorders of the spine, and Listing 12.00, mental impairments; (3) Ms. Hopper retained the residual functional capacity to perform the exertional and nonexertional requirements of work because the medical record in its entirety demonstrated that she had no greater limitations in her ability to perform work activities than those reflected in the residual functional capacity determination reached in her case, and the objective medical evidence did not fully support and was inconsistent with Ms. Hopper's subjective complaints; and (4) based on the testimony of the vocational expert, Ms. Hopper had acquired work skills from past relevant work that were transferrable to other jobs that existed in significant numbers in the national economy. R. at 71-79. The ALJ concluded that, considering the claimant's age, education, and transferable work skills, a finding of "not disabled" was appropriate under the Medical-Vocational Rule 201.28. R. at 79.

On June 10, 2008, the Appeals Council vacated the July 11, 2007 order and remanded the case to the ALJ for resolution of two issues. First, the Appeals Council noted that Ms. Hopper's

medical evidence indicated that she was obese but that the hearing decision did not contain any evaluation of obesity. R. at 82. Second, the Appeals Council noted that the VE's testimony did not establish transferability because skills from past work cannot transfer to unskilled jobs (Social Security Ruling 82-41). *Id.* However, it also determined that citation to a significant number of unskilled jobs that Ms. Hopper could perform would be sufficient to support a denial. *Id.*

The Appeals Council instructed the ALJ to reevaluate Ms. Hopper's maximum residual functional capacity for the period of time through and including September 30, 2004 and to provide an appropriate rationale with specific references to record evidence in support of the assessed limitations. R. at 83. Further, the Appeals Council directed the ALJ to evaluate the limitations caused by Ms. Hopper's obesity and to obtain, if warranted, supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base. *Id.*

D.  **The ALJ's Second Hearing & Decision**

The ALJ held a second hearing on September 30, 2008. At that time, Ms. Hopper again testified that she was unable to work because of back, arm and leg pain, narcotic medication, carpal tunnel, anxiety, and depression. She testified that pain

medication and epidural injections had not relieved her pain in the past, and that she would have been willing to undergo back surgery but her doctors found her to be ineligible. R. at 757. Ms. Hopper also testified that she had participated in physical therapy and used the TENS machine, a device that uses electric current to stimulate the nerves for therapeutic purposes, which marginally relieved her pain at times, but not consistently. R. at 760. Ms. Hopper testified that she worked hard to function without pain medication, opting for "mental concentration" and endurance to bear the pain. R. at 772-773, 777. Ms. Hopper added that, regardless of whether she takes pain medication or not, she is unable to work eight hours a day, five days a week. R. at 777.

Next, the ALJ heard from Dr. Cavenaugh, a board certified internist and medical expert, who testified that the medical evidence of record would reasonably limit Ms. Hopper to a sedentary level of activity. R. at 785. Dr. Cavenaugh found physical and environmental limitations consistent with Dr. Girzadas' findings in the first ALJ hearing. R. at 785. Dr. Cavenaugh testified that he considered Ms. Hopper's side effects from medication in determining that she is capable of sedentary activity. R. at 786. Dr. Cavenaugh also noted that the record did not show any objective evidence of functional impairment,

16